IN THE UNITED STATES DISTRICT COURT
FOR
THE MIDDLE DISTRICT OF ALABAMA


THE UNITED STATES
OF AMERICA

    vs.

ADRIAN MOULTRY

CRIMINAL ACTION NO.

2:03-CR-267


SENTENCING


\* \* \* \* \* \* \* \* \* \*


HEARD BEFORE:    The Hon. Myron H. Thompson

HEARD AT:    Montgomery, Alabama

HEARD ON:    February 4, 2005

APPEARANCES:    Matthew S. Miner, Esq.

    Susan G. James, Esq.

Page 2

1  WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HEARD BEFORE THE HON.
   MYRON H. THOMPSON ON FEBRUARY 4, 2005 AT THE UNITED STATES
2  COURTHOUSE IN MONTGOMERY, ALABAMA:

3

4       THE COURT: The Court calls the case of United States
5  vs. Adrian Moultry, criminal action number 2:03-CR-267-T.
6       Is the defendant ready to proceed?
7       MS. JAMES: Yes, Your Honor.
8       THE COURT: Okay. And is the Government?
9       MR. MINER: The Government is ready, Your Honor.
10      THE COURT: Now we haven't had any earlier
11 proceedings, is that correct?
12      MS. JAMES: No, sir.
13      MR. MINER: That is correct.
14      THE COURT: A lot of these are continuations. I
15 wanted to make sure I wasn't missing something here.
16      Will the defendant come forward.
17      Now, is this Mr. Moultry?
18      MS. JAMES: Yes.
19      THE COURT: Now, Mr. Moultry, have you reviewed the
20 presentence report including any revisions that may have been
21 immediate after the initial disclosure?
22      THE DEFENDANT: Yes, sir.
23      THE COURT: Now was there a plea in this case?
24      MR. MINER: There was, Your Honor.
25      THE COURT: And was there a plea agreement?

Page 3

1       MR. MINER: Yes, Your Honor.
2       THE COURT: Would you state the plea agreement?
3       MR. MINER: Yes, Your Honor. The agreement calls for
4  the defendant to plead guilty to all three counts in the
5  indictment. In exchange for the defendant's entry of a plea of
6  guilty and acceptance of responsibility, the Government agreed
7  to move for three points -- well, agreed to three points in
8  reduction in his offense level under the guidelines for
9  acceptance of responsibility, including the third point motion
10 that is often filed and filed in this case.
11      The United States agreed that the bottom end of the
12 applicable guideline range should apply in this instance. This
13 is a case, Your Honor, that is, under the guidelines at least,
14 not in the chart, so I can't --
15      THE COURT: What do you mean "not in the chart"?
16      MR. MINER: In a second, your Honor, I'll explain
17 exactly what I mean. It's a career offender guideline, and the
18 chart that has the grid doesn't apply exactly because it's
19 removed and there are three different sets of numbers based
20 upon acceptance of responsibility. But using those numbers,
21 Your Honor, the Government agreed that the low end would be two
22 hundred and sixty-two months of imprisonment.
23      The Government also agreed that it would file a
24 motion for downward departure or a rule thirty-five motion for
25 reduction of sentence based upon the defendant's cooperation.

Page 4

1       The defendant in exchange for those provisions agreed
2  to plead guilty, agreed to waive his rights to appeal and
3  collaterally attack his sentence, and agreed to provide
4  substantial assistance. And let me say, Your Honor, that to
5  date the defendant has provided some degree of substantial
6  assistance.
7       THE COURT: Okay. So you're actually recommending a
8  sentence at the low end of the guideline range which would be
9  two hundred and sixty-two months, reduced by -- was it four
10 years under your motion?
11      MR. MINER: Yes, Your Honor. I moved for four years
12 and let me explain the basis for that.
13      THE COURT: Well let me complete this.
14      MR. MINER: Yes, Your Honor.
15      THE COURT: Which would translate into, what is that,
16 forty-eight months?
17      MR. MINER: Yes, Your Honor.
18      THE COURT: Which would mean a sentence of two
19 hundred and fourteen months.
20      MR. MINER: Yes, Your Honor.
21      THE COURT: That's what you're really recommending.
22      Okay. Now you were going to tell me why you
23 recommended four years?
24      MR. MINER: Yes, Your Honor. Mr. Moultry to date has
25 cooperated with law enforcement; has met with law enforcement;

Page 5

1  has been very forthcoming with information. His information
2  has been very useful in investigations, however the
3  investigations are ongoing and based upon my communication with
4  the case agent there has not been any testimony and the cases
5  have not culminated in anything quite yet. But the information
6  has been helpful, and the Government wanted to file this motion
7  simply in consideration for the information that Mr. Moultry
8  has provided. And it has been very useful.
9       But the Government anticipates that once those cases
10 develop, that there will be testimony and there will be further
11 motions.
12      THE COURT: Okay. Yes? With regard to the plea
13 agreement, anything else, Miss James?
14      MS. JAMES: No, Your Honor. That was accurate.
15      THE COURT: So under the plea agreement, the -- as I
16 said, the Government is essentially asking for a sentence of
17 two of hundred and fourteen months.
18      Now what's your response to that, Miss James? What
19 objections do I have to take up?
20      MS. JAMES: Judge, the two most significant
21 objections were objections to the armed career criminal
22 enhancement and to the career offender enhancement. The
23 pleadings that I filed were done I guess subsequent to the
24 Blakely decision, and my arguments in the pleadings that a
25 filed were consistent with the holding in Blakely. Quite

Page 6

1 frankly, that is my argument today with regard to those two
2 particular enhancements.
3     At the plea colloquy Mr. Moultry was not asked, nor
4 did the Government establish a factual basis to support those
5 two particular enhancements. And I think consistent with the
6 U. S. Supreme Court's holding in Booker, at least the majority
7 opinion in the first -- the first question about the
8 guidelines, my position is that in order to use these --
9     THE COURT: Use what?
10    MS. JAMES: These two enhancements, the armed career
11 offender and the career offender enhancement. That the
12 Government would have to charge it and prove it, or in the
13 alternative in the case of a plea, that the defendant would
14 have to admit that conduct. And this record is silent to any
15 admission on Mr. Moultry's part in that regard.
16    We've concede, of course, that the criminal history
17 score is based -- I mean the arrest and convictions are there.
18 They are part of the record. I did suggest in one of my
19 pleadings that, and not knowing how the Supreme Court was going
20 to rule on Blakely and its application to the guidelines, that
21 the burglaries that were referenced in the presentence report
22 that form in part the basis for the enhancement were spree
23 conduct, if you will.
24    THE COURT: They were what?
25    MS. JAMES: They were spree conduct. In other words,

Page 7

1 there were -- He was eighteen years old and there were a series
2 of burglaries that occurred on the 29th. They all occurred the
3 same day, Your Honor. And those are being used in part to,
4 based on the presentence report, to suggest the enhancements
5 under armed career offender and under the career offender.
6     This plea contemplates a minimum sentence of twenty
7 years, Your Honor, because fifteen years on the 924(e). That
8 in and of itself takes into account his prior criminal history
9 and having three prior convictions. In other words, rather
10 than a 924(c) where you have a sixty month sentence, because of
11 the prior convictions, prior qualifying of convictions, he was
12 charged under 924(e) which requires a fifteen year sentence.
13 And the 924 -- am I correct on that?
14    MR. MINER: The twenty years is for both the 924(c)
15 charge and the 924(e).
16    MS. JAMES: Right. It's a combination, Judge. It's
17 the 924(c) and the 924(e) that causes this to be a twenty year
18 term.
19     It's our position, and without moving to withdraw the
20 plea of guilty and, quite frankly, we contemplated that, given
21 the fact that we pled under the pre Blakely decision, but we
22 have collectively made a decision that it's appropriate for us
23 to stay where we are and not move to withdraw the plea. But
24 given the posture of where we are right now, the least sentence
25 that the Court could impose regardless of whether the

Page 8

1 guidelines is advisory or not is twenty years absent the
2 Government's motion for a downward departure.
3     So the Government's motion for a downward departure
4 puts us in a discretionary position in terms of what the Court
5 can do, because the Court now can impose any sentence, I guess,
6 that it --
7     THE COURT: They're asking me -- The Government is
8 asking me to give a sentence of two of hundred and fourteen
9 months, which is twenty-six months -- no, I'm sorry, is that
10 right?
11    MS. JAMES: Forty-eight months.
12    THE COURT: The Government, you said twenty years was
13 the maximum sentence, right?
14    MS. JAMES: The Minimum.
15    THE COURT: I mean the minimum sentence. Which is
16 two hundred and forty months, is that right?
17    MS. JAMES: Right.
18    THE COURT: The Government is asking me to give a
19 sentence of two of hundred and fourteen months, which is
20 twenty-six months below the minimum sentence.
21    MS. JAMES: They're doing that, Judge, based on --
22 They're operating from a guideline range of two sixty-two.
23    THE COURT: Right. I understand that. All I'm
24 saying is that they're asking for a sentence that's twenty-six
25 months below the minimum.

Page 9

1     MS. JAMES: Right.
2     THE COURT: And so that's, you know --
3     MS. JAMES: If I didn't prevail on any of my
4 arguments and the Court were operating from the twenty year
5 minimum and simply gave the four levels -- or four years off of
6 that that the Government suggested, the forty-eight months off
7 of two hundred and forty months would be a hundred and
8 ninety-two months. And Mr. Miner references this in
9 anticipation that that might be my argument in his Booker
10 pleading.
11    I guess Booker pleading, right?
12    MR. MINER: Footnote one.
13    MS. JAMES: It's at footnote one, Your Honor.
14    But having said all that, we still can't -- I can't
15 get around my position that if you're going to use -- I mean I
16 think clearly you can go below the twenty years based on the
17 Government's motion. And so given that I would assume that the
18 Court would look at what at guideline provisions are in terms
19 of the calculation of the of guidelines, because we -- our
20 position is that the guidelines were incorrectly determined
21 based on the application of the career offender and the armed
22 career offender provision because he would be just straight up
23 on the drugs that were in the car --
24    THE COURT: Without the guidelines, he's looking at
25 twenty years no matter what.

Page 10

1  MS. JAMES: And without the Government's motion.
2  THE COURT: That's what I'm saying, without the
3  guideline ranges, if the guidelines didn't exist we would be
4  looking at a twenty year sentence. The only way he gets below
5  twenty years is the Government has to file a motion for
6  substantial assistance.
7  MS. JAMES: Right. And that's occurred. It's now up
8  to you as to whether or not to grant it. But given that
9  scenario, now that the Court can go below the twenty years,
10 then I think -- and what I've seen here consistent with what
11 you did in that case, a guideline analysis is probably
12 appropriate because obviously I'm going to ask you to simply
13 use them as advisory and to give of him a sentence of less than
14 that suggested in the presentence report and less than
15 requested by the Government. And my argument is not real
16 complicated with regard to those two provisions. And that
17 simply is --
18 THE COURT: Those two provisions being the armed
19 career and career?
20 MS. JAMES: Right. Because what those did, Your
21 Honor, it took him from a base level of twenty-six, okay?
22 That's where he would be without those two provisions. And
23 bumped him up, based on the guideline provisions I believe
24 under -- I can't find it now. But the two -- That bumps him up
25 to a level thirty-four and a criminal history score of six.

Page 11

1  Now given his prior convictions he scores a criminal history
2  score of six anyway. So that part can really hurt him.
3  What hurt him was the bump from the level twenty-six
4  up to a level thirty-four. With the Government's motion for
5  the extra level for acceptance of responsibility, that would
6  put him at either a level thirty-one, which is now suggested in
7  the presentence report and adopted by the Government, or under
8  my argument a level twenty-six minus three puts him at a level
9  twenty-three, criminal history score of six.
10 If the Court doesn't accept all of my arguments, the
11 guidelines for that, Judge, would be ninety-two to one hundred
12 and fifteen months if I failed on all my arguments in terms of
13 the appropriate calculation of the guidelines.
14 You follow what I'm saying?
15 THE COURT: Now if you fail on all of your
16 calculations under the guidelines, how do you get --
17 MS. JAMES: Well I guess what I'm saying is if I
18 prevail on the two objections, then -- I'm sorry, I misstated
19 that, Your Honor. If I prevail on my two objections, we would
20 be at a base level of twenty-three.
21 THE COURT: Right.
22 MS. JAMES: And even with the criminal history score
23 of six, and I've got an argument that that overrepresents, but
24 assuming that I failed on that, the criminal history score of
25 six, base level twenty-three would put him in the guidelines of

Page 12

1  ninety-two to one hundred and fifteen months. And that's
2  really where I think he stands with the guidelines. And that
3  is based on a Blakely argument, not a Booker argument. And --
4  well, I guess Booker as well in terms of what the majority
5  decided in the first question presented to the Court.
6  THE COURT: Well why don't we discuss, then, the
7  armed career and career to see where we end up on that. Now
8  what's your argument as to why armed career doesn't apply?
9  MS. JAMES: Well, the argument that I made before we
10 had the decision in Booker, and the argument that I maintain
11 today even in light of Booker, is that those two provisions
12 were not established with the factual basis by the Government
13 at Mr. Moultry's change of plea. Mr. Moultry did not admit to
14 the conduct that would be sufficient for those two
15 enhancements.
16 In other words, the Government would have said to him
17 do you agree that you have these prior convictions, and do you
18 agree that, you know, you qualify for the armed career offender
19 or for the career offender. And that simply did not happen.
20 And I think under Blakely and Booker, those two provisions are
21 inappropriate because if applied here because they were not
22 charged nor did he admit he did it.
23 THE COURT: Okay. Now is there a difference between
24 career and armed career?
25 MS. JAMES: He's just getting -- Am I right Mr.

Page 13

1  Lancaster? He's just getting the increase one time?
2  THE PROBATION OFFICER: Yes, sir, they refer you back
3  to -- the armed career refers you back to the career offender.
4  MS. JAMES: And we're only getting the one
5  enhancement, Judge.
6  We get the bump to the level thirty-four, right?
7  THE PROBATION OFFICER: Yes, ma'am.
8  THE COURT: And those are based on the fact that he
9  has two prior felony convictions?
10 MS. JAMES: No, sir, he has more than that. That's
11 part of the problem. To have qualify for the armed career --
12 the statutory armed career offender, he had to have three
13 prior. And under -- and I guess that's true for the guidelines
14 as well. Under the career offender he only has to have two
15 prior qualifying.
16 And of course another problem here with these two
17 enhancements is that these were burglaries of unoccupied
18 dwellings. And there is -- My position is that those should
19 not and do not constitute a crime of violence. If we were back
20 in the old days before Blakely and Booker, you would be making
21 -- likely making a preponderance finding that if he challenges
22 it, that yes, those are in fact crimes of violence.
23 So there is room for dispute here, Your Honor, with
24 regard to it's not just these are prior convictions. If there
25 were three murders, we would know that they were crimes of

Page 14

1 violence, but there is that gray area. So not only -- and That
2 makes even the Government's factual basis and his admission and
3 acceptance for those offenses even more important, because
4 there is that gray area of whether they're crimes of violence.
5      THE COURT: Let's just take up each of your
6 objections separately. I'm a little confused now.
7      MS. JAMES: Judge, that's usually my style.
8      THE COURT: Pardon me?
9      MS. JAMES: I said that's planned, to try to confuse
10 you.
11      (Laughter.)
12      THE COURT: Well the law does that enough. You don't
13 need help on that.
14      Whether the burglaries are crimes of violence, I
15 don't see how a burglary of a residence could not be a crime of
16 violence.
17      MS. JAMES: Unoccupied dwellings.
18      THE COURT: I don't even understand how a burglary of
19 an unoccupied dwelling could not be a crime of violence. I'm
20 sure that most crimes, in particular in burglaries, come when
21 you're in a house and somebody comes home and the burglar is
22 surprised and a gun is drawn. And that's what he people get
23 killed. That's why police officers tell you if your house is
24 being broken into, don't go in it. That is probably the most
25 dangerous, is when it's unoccupied and some innocent person

Page 15

1 comes back, they he go in, the burglar is surprised and bang,
2 you've got someone dead.
3      I almost think that the likelihood of the crime
4 occurring is that scenario. It's that surprise element that
5 makes it so dangerous. Most of the time I assume when a
6 burglar goes into a house thinking that, you know, assuming
7 he's crazy enough when someone is there, at least you don't
8 have that surprise element. And I think that's why in the case
9 of United States vs. Ray, 245 F.3d, 1256, the Court said that
10 the burglary of a hotel guest room, occupied or not, was a
11 crime of violence. It was a dwelling.
12      So I think the burglary of a dwelling is just a
13 powder keg for violence, pun intended. Occupied or not.
14      What's the next objection? Was the career offender
15 now?
16      MS. JAMES: Well both of these -- One objection is to
17 the armed career criminal application. The Government -- I
18 mean the probation office put it in a presentence report kind
19 of as an either/or, if you didn't find one you could probably
20 find the other.
21      THE COURT: Now the armed career is -- you have to
22 have how many convictions?
23      MS. JAMES: You have to have three.
24      THE COURT: And the career you have to have two?
25      MS. JAMES: Yes, sir. And armed, I believe, is three

Page 16

1 crimes of violence. And a career is one drug offense and/or
2 crime of violence, too.
3      THE COURT: And you applied for the career offender
4 guideline 4B1.1?
5      THE PROBATION OFFICER: Yes, sir.
6      THE COURT: Okay. And that says the defendant must
7 be at least eighteen years old at the time of the offense. The
8 offense is a crime of violence, and the defendant has at least
9 two prior felony convictions of either a crime of violence or a
10 controlled substance. That's the career offender.
11      Now I think the question as to when has a crime of
12 violence of the two convictions or three convictions turns on
13 whether his burglary convictions were part of a single scheme
14 or plan. Is that correct?
15      MS. JAMES: With regard to the armed career criminal
16 provision, yes, Your Honor, because that requires three. And
17 if we were successful on the spree argument, that would be two.
18      THE COURT: What about the career offender?
19      MS. JAMES: He would qualify.
20      THE PROBATION OFFICER: The Court is correct in both
21 instances. If found these burglaries were related, it would
22 nullify armed career and career, because I would suspect all of
23 these ten burglaries came out of the same occasion, which if
24 you gave them one set of points, it would nullify the career
25 offender status.

Page 17

1      THE COURT: How does that work? Explain that to me.
2 Now he has to have --
3      THE PROBATION OFFICER: At least two prior felony
4 convictions --
5      THE COURT: Of either a crime of violence or a
6 controlled substance.
7      THE PROBATION OFFICER: Yes, sir. And the section
8 that's pertinent to distinguishing whether or not those are
9 separate --
10      THE COURT: He doesn't have a controlled substance
11 conviction.
12      MS. JAMES: Right. That's why he -- Mr. Lancaster is
13 correct, it would nullify both of them.
14      THE COURT: That's right. So it's either two under
15 career or three under armed career.
16      MS. JAMES: Right. And because the countable priors
17 are in fact the burglaries, then --
18      THE COURT: So what this comes down to is whether as
19 you call it a spree, that is part of a single scheme or plan.
20      MS. JAMES: Right.
21      THE COURT: Why don't you describe the burglaries to
22 me.
23      MS. JAMES: Well, Judge, basically the only
24 information that I have is what's contained within the
25 presentence report. And it does appear in looking at these

Page 18

1  that they were all in the same day, which was August the 29th.
2  Actually, they begin on page nine of the presentence report,
3  paragraph thirty.
4      And it does say here that a couple of them are listed
5  as on the 28th of August, which would be the day before the
6  arrest. But it appears if you look at the first one at
7  approximately four-fifteen p.m., that's on the 28th, the next
8  one the presentence report indicates on the 28th at eight
9  forty-one p.m. In other words, one was at four o'clock. Then
10 there was another one on the 28th at eight forty-one p.m. And
11 of course this is information based on the victim's complaint
12 to the police. So those times aren't exact, Your Honor, you
13 understand. But they're in relative close proximity.
14     Then the next one is August 28, two thousand --
15     THE COURT: Give me those dates again, now. August
16 what?
17     MS. JAMES: August 28th. The presentence report
18 indicates that all of these either occurred on August 28th or
19 August 29th.
20     THE COURT: Of 2000?
21     MS. JAMES: Of 2000.
22     And I'm just going by the times in the presentence
23 report, but it appears that they were reported -- the
24 presentence report indicates they were reported at a particular
25 time, but they didn't speculate as to what time. On the first

Page 19

1  one they said sometime between one and four p.m., and I'm
2  assuming they're come up with those times because people say I
3  was home, you know, I came home for lunch and I came back at
4  four and it happened sometime in between. And that was that
5  was the first one. And that was a burglary where a VCR and a
6  DVD and a microwave was stolen. Some weapons.
7      Then the next one is -- That one indicates again on
8  August the 28th, and it says here that the place was
9  burglarized sometime between seven-thirty a.m. and eight-thirty
10 a.m. Again, this was a home burglary where CD players, VCR,
11 binoculars were stolen.
12     THE COURT: Okay. Now -- Go ahead.
13     MS. JAMES: The next one, judge, was on the 28th of
14 August 2000, and it was a home burglary and it occurred between
15 one forty-five p.m. and three-fifteen p.m. Again, VCRs, CD's,
16 play stations and those type things were taken.
17     Then we have another one, and this one is the
18 following day. And this is August the 29th, 2000, and it
19 appears to be another home burglary. However, there is not a
20 time on that one, Judge. Same type items were taken.
21     Then the next one is listed as August the 29th, 2000.
22 Another -- And by the way, these are like right next door to
23 each other.
24     THE COURT: What's next door?
25     MS. JAMES: Well the one I described on the 29th, it

Page 20

1  was at lot twenty-one.
2      THE COURT: All ten burglaries were over a two day
3  period?
4      MS. JAMES: Yes. And, for instance -- and this adds
5  to my spree thing -- they rolled from one house to another.
6      THE COURT: Where are these housed located?
7      MS. JAMES: In Troy, Alabama.
8      THE COURT: How many houses, ten houses?
9      MS. JAMES: Yes, sir.
10     For instance, this one, Judge, that I'm describing
11 now that doesn't have a time, it occurred on August 29th, 2000,
12 it occurred, a residence at one oh seven Pecan Drive. That's
13 in Troy. The next one that's listed here, August 29th, 2000
14 occurred at one oh six Pecan Drive next door.
15     THE COURT: What's the time period for the ones on
16 the 28th? What period of time did they occur on? You said
17 from one forty-five to three-fifteen? Were all of those
18 committed on the 28th?
19     MS. JAMES: I gave you the three that were committed
20 on the 28th.
21     THE COURT: There were three on the 28th?
22     MS. JAMES: Yes, sir.
23     THE COURT: And what, were there seven on the 29th?
24     MS. JAMES: I believe so.
25     THE COURT: And the three on the 28th were between

Page 21

1  one forty-five and three-fifteen?
2      MS. JAMES: Well, I gave them to you out of order
3  because that's the way they appear in the presentence report,
4  Judge, but actually I think it started the morning of the 28th
5  at seven in the morning.
6      THE COURT: What period of time did they occur over
7  which did they occur on the 28th, the three that occurred on
8  the 28th starting when until when?
9      MS. JAMES: That's what I'm looking for. Okay. The
10 first one occurred on the 28th between seven-thirty and
11 eight-thirty a.m. Okay? The next one occurred on the 28th
12 between -- I'm sorry, Judge. I was confused. It was actually
13 seven-thirty a.m. between seven-thirty a.m. and eight-thirty
14 p.m. You know, people, they come home and they find their
15 stuff missing and it's like well, it must have happened while I
16 was at work.
17     THE COURT: Right.
18     MS. JAMES: Okay. But it could have happened as
19 early as seven-thirty in the morning.
20     THE COURT: Okay.
21     MS. JAMES: Or as late as eight-thirty at night on
22 that day.
23     Then we have one --
24     THE COURT: Still on the 28th?
25     MS. JAMES: Yes, sir.

Page 22

1      The next one occurred between one and four o'clock
2 p.m. on the 28th.
3      And then we have one on the 28th that occurred
4 between one forty-five and three-fifteen p.m.
5      THE COURT: Okay. Now those occurred on the 29th,
6 what time did they occur?
7      MS. JAMES: On the 28th.
8      THE COURT: Yes, but on the 29th?
9      MS. JAMES: On the 29th we have one that -- actually,
10 Judge, they don't have a time. These are two that happened in
11 a trailer park. There is no time given, but these were the two
12 that were next door to each other. One was at One oh seven
13 Pecan Drive and that's on the 29th. The next one was on the
14 29th at One oh six Pecan Drive and it doesn't give a time
15 either. And then, Judge, there is yet another one at one oh
16 four Pecan Drive.
17      THE COURT: Okay. Give me those times again, now.
18      MS. JAMES: We don't have times, Judge. But the
19 three of them, and my argument would be they had to be in close
20 proximity because they had One oh four, One oh six and One oh
21 seven Pecan Drive, all on the same day.
22      THE COURT: So you don't know what time.
23      MS. JAMES: No, sir.
24      And then we have yet another one, we're still on
25 Pecan Drive, we have another one on Pecan Drive on the 29th

Page 23

1 with no time, but it's at One oh two Pecan Drive. And then we
2 have yet another one, and this one says, Judge, it's another
3 one on the 28th, I'm just taking them in order that they're
4 listed in the presentence report.
5      THE COURT: Okay.
6      MS. JAMES: So you've got to go back to the 28th,
7 Judge.
8      THE COURT: Okay.
9      MS. JAMES: If you go back to the 28th, we need to
10 add one more between one-thirty p.m. and four ten p.m.
11      THE COURT: Mm-hmm.
12      MS. JAMES: And then we have another one on the 29th,
13 and it does have a time. And it says between six ten a.m. and
14 four oh four p.m. And it is another residence in Troy.
15      THE COURT: Okay. Now let me ask you this. Where is
16 there evidence -- What is the evidence as to whether all of
17 these crimes were jointly planned?
18      MS. JAMES: That will have to come from Mr. Moultry.
19      THE COURT: Okay. Do you plan on putting him on?
20      MS. JAMES: I will for this purpose.
21      THE COURT: Okay. Did the commission of one burglary
22 necessitate the commission of another?
23      MS. JAMES: That I'm not sure.
24      THE COURT: I can see how that could happen. I mean
25 it may be that he was burglarizing to get a trespass to do or

Page 24

1 something, you know, to go over certain other property. I mean
2 it could have crimes that are connected in that way, but I
3 don't see how that applies here.
4      Were the crimes directed at a common victim? Ones
5 against the same person?
6      MS. JAMES: They were not the same person, they were
7 neighbors in several instances.
8      THE COURT: They were different people.
9      MS. JAMES: Right.
10      THE COURT: They all involved the same substantive
11 offense?
12      MS. JAMES: Yes.
13      THE COURT: Were they solved in the course of a
14 single criminal investigation?
15      MS. JAMES: Yes. The arrests all occurred on the
16 29th of August, which is actually the second day of the spree.
17      THE COURT: Were the crimes -- Did they share a
18 common modus operandi?
19      MS. JAMES: Yes. They were kicking the doors in.
20      THE COURT: Okay. Were they animated by the same
21 motive?
22      MS. JAMES: Yes.
23      THE COURT: Which was what?
24      MS. JAMES: Money.
25      THE COURT: Did he plead, or was there a trial?

Page 25

1      MS. JAMES: He pled. There were other people
2 charged, too. There were four other people.
3      THE COURT: Was he sentenced for all of these at one
4 time, or was he sentenced separately on each one?
5      MS. JAMES: He was sentenced the same day, all of
6 them would be on April the 30th, 2001.
7      THE COURT: Were there separate sentences, or was
8 there just one sentence?
9      MS. JAMES: Just one sentencing. And these were all
10 -- The sentences were ordered to run concurrent with each
11 other, Your Honor.
12      THE COURT: And what were they?
13      MS. JAMES: Ten years in the state penitentiary
14 split, placed on five years probation and ordered to serve two
15 years in the custody of the Alabama Department of Corrections.
16      THE COURT: Okay. Were they jointly planned?
17      MS. JAMES: Yes.
18      THE COURT: He and the other people planned them?
19      MS. JAMES: Yes.
20      THE COURT: They were committed within a short period
21 of time?
22      MS. JAMES: Yes, Your Honor.
23      THE COURT: Two days?
24      MS. JAMES: Yes.
25      THE COURT: What about the geographic proximity?

Page 26

1  MS. JAMES: Well, I don't know if you've been to
2  Troy. Troy is not a very large city. But was there one on one
3  side of the town and one was there another on another side of
4  the town? I know that some of them were next door to each
5  other. That doesn't mean they were all next door to each
6  other.
7  MS. JAMES: Right. Well two trailer parks were
8  involved. For instance, Dozier Trail Park and Whispering Pines
9  Trailer Park. And they were both located on Highway 231, and
10 one -- I'd say they're probably, at max, those two trailer
11 parks are five miles apart. I'm not certain. And those,
12 Judge, would go to the Pecan Drive burglaries were in a trailer
13 park. I'm sorry, it's Whispering Woods Trailer Park.
14 THE COURT: Now you keep using the word "spree,"
15 right?
16 MS. JAMES: Yes, sir.
17 THE COURT: Do you know the Seventh Circuit has said
18 that crimes are not related just because they have a similar
19 modus operandi or because they are part of a crime spree.
20 That's 209 F.3d, 1020 at page 1023. It's a 2000 Seventh
21 Circuit case. So to call them a "spree" doesn't necessarily
22 mean that you -- the crimes are related for purposes of this
23 provision.
24 MS. JAMES: Well in this case, Judge, we had a group
25 of five friends who got together --

Page 27

1  THE COURT: I'm just saying you keep calling it a
2  spree. I just wanted you to know that one court has
3  specifically and expressly rejected that as a basis for
4  concluding that the crimes are related. So I just wanted you
5  to understand that even if I agree there is a spree, that
6  doesn't necessarily get you safely into home base.
7  MS. JAMES: Yes, sir.
8  Did I give you the last one?
9  THE COURT: What's that?
10 MS. JAMES: I wanted to make sure I went over all ten
11 of them with you.
12 THE COURT: Did I get ten factors?
13 MS. JAMES: No, I meant the last burglary. And I
14 told you you had to go back to the 29th and add another one
15 between eleven forty-five a.m. and three ten p.m.
16 THE COURT: Yes, right. Well it looks to me like the
17 burglaries were committed on the 28th anywhere from between
18 seven-thirty and eight-thirty. And it looks like the ones on
19 the 29th were committed sometime between ten and late in the
20 evening, too. So what we have is burglaries, a series of
21 burglaries committed on two separate days with an interval in
22 between.
23 I think you need to respond to a couple of arguments.
24 Of the first one being that it could be argued that the
25 burglaries are related, but it could also be argued that there

Page 28

1  were two separate groups of burglaries. So to merely say that
2  the burglaries are related doesn't mean that he still couldn't
3  have two separate crimes, he could have just two groups of
4  burglaries or three groups of burglaries.
5  But I want to ask the Government if it agrees with
6  the characterizations that I got on my questions. The first
7  one being were the crimes jointly planned.
8  MR. MINER: Your Honor, as to the joint planning, I'm
9  not certain whether Mr. Moultry -- because that was not a part
10 of the plea in that case, however I'm not sure as to the Armed
11 Career Criminal Act how that relates. I can see how the Court
12 might be looking at that in terms of the guideline language as
13 it relates to the career offender.
14 THE COURT: How does it not apply to the career
15 offender?
16 MR. MINER: The career offender under the guidelines,
17 Your Honor, doesn't use the relatedness language in looking at
18 prior convictions. That same language is not used in the Armed
19 Career Criminal Act, Section 924(e). That is not a guideline
20 driven analysis.
21 THE COURT: How does he differ, though?
22 MR. MINER: It differs, Your Honor, because I found
23 some cases that look specifically at burglaries. And the
24 questions you're asking did not come up in those cases. I cite
25 the Court to the Eleventh Circuit case after United States vs.

Page 29

1  Lee, April 13th, 2000, 208 F.3d 1306 in which the Eleventh
2  Circuit affirmed a lower court's imposition of the armed career
3  criminal fifteen year mandatory minimum based upon two prior
4  burglary convictions, the convictions -- or rather two prior
5  convictions, one being a robbery and one being a burglary that
6  occurred within minutes of each other. The robbery occurred in
7  one part of town, the burglary related to a shed that a man
8  broke into after his car broke down and he began running.
9  In that case the Eleventh Circuit looked at an
10 earlier case, the Pope case that I can't think Your Honor was
11 mentioning the language, or at least the spirit of Pope, where
12 the Court quoted Pope, and this is at page 1307 where the Pope
13 court held that, quote, "So long as predicate crimes are
14 successive rather than simultaneous, they constitute separate
15 criminal episodes for purposes of the Armed Career Criminal
16 Act." By, quote, "successive," the Pope panel meant that the
17 crimes were separated by, quote, "a meaningful opportunity to
18 desist activity before committing the second offense." And
19 that the crimes reflected, quote, "distinct aggressions,
20 especially if the defendant committed the crime in different
21 places." The Pope case, Your Honor --
22 THE COURT: Okay. Let me just see now. For the
23 statutory career definition, you're saying that I don't look to
24 this relatedness, is that correct?
25 MR. MINER: That is correct, Your Honor.

Page 30

1  THE COURT: Only for the guideline career definition
2  do I look at relatedness.
3  MR. MINER: And let me explain how that comes in,
4  Your Honor. That's because under the guidelines, when you
5  figure out whether the prior convictions count, you look to the
6  underlying definition for how you count convictions for
7  criminal history purposes under Section 4A1.1. And that is a
8  standard analysis throughout the guideline book whether you're
9  determining Mr. Moultry's criminal history category if he is
10 not a career offender, or if he's a career offender.
11     And so I think it's important to keep those distinct
12 from one another. The question is whether, even if the
13 relatedness question is answered in Mr. Moultry's favor, he
14 still runs up against the two hundred and forty month mandatory
15 minimum mandatory because that same analysis is not used in the
16 same Armed Career Criminal Act context.
17     Does that make sense, Your Honor? I hope I explained
18 that.
19     THE COURT: I thought because you had gone under the
20 two hundred and forty months, I thought she just wanted to look
21 at the guideline and see what the guideline would be, period.
22     MS. JAMES: Judge, I understand what he's saying, but
23 we're kind of talking apples and oranges, although we're
24 talking about the armed career offender. One is statutory.
25 We're not challenging that. We've pled to that, and in the

Page 31

1  qualifying that he has, quote, three qualifying felonies.
2     THE COURT: Oh, I see.
3     MS. JAMES: We've already pled to that. That's not
4  in dispute. What is in dispute is the Court's advisory
5  consideration of the guidelines and where we're going to start
6  from if you grant their motion for downward departure.
7     THE COURT: I see what you're saying.
8     So he's already pled under the statutory definition
9  of armed career offender.
10    MS. JAMES: Right.
11    THE COURT: Is it armed career or just career?
12    MS. JAMES: It's armed career.
13    THE COURT: Armed career offender. You can't dispute
14 that, because that's part of his plea.
15    MS. JAMES: Right.
16    THE COURT: So we agree he has, is it two or --
17    MS. JAMES: He had to have three.
18    THE COURT: He has three felony convictions for that.
19    MS. JAMES: Right. And we've pled to that. And
20 short of withdrawing our plea, we have no way of getting around
21 that. But it is a different matter with regard to the
22 application under the guidelines. We're not precluded from
23 making that argument under the guidelines. And that's my
24 position.
25    THE COURT: I got you now. I see where you're coming

Page 32

1  from.
2     So you're just focusing on the guidelines.
3     MS. JAMES: Yes, sir, not the statutory part.
4     And, by the way, the Pope case is in part my case. I
5  did the twenty-two fifty-five in that case, and he was -- he
6  got a very generous sentence the first time and was consistent
7  on the appeal. And so his sentence went from ninety-seven
8  months to about three hundred and forty months on appeal. And
9  then we did the twenty-two fifty-five. He was resentenced, he
10 appealed and lost on that and did the twenty-two fifty-five.
11 There is language in that case that talks about --
12    THE COURT: Was this Judge Hobbs' case?
13    MS. JAMES: No, it was a judge in Macon, Georgia.
14    MR. MINER: Judge Fitzpatrick.
15    MS. JAMES: Judge Fitzpatrick over in Macon, right.
16    And in that case there were two medical buildings
17 side-by-side that were burglarized at the same time. So that
18 case doesn't help me much.
19    THE COURT: Right. But those are based on the
20 statute, is what you're saying.
21    MS. JAMES: Well that was a guideline case too, Your
22 Honor.
23    THE COURT: Oh, it was?
24    MS. JAMES: Yeah. It was a guideline case. He was
25 convicted of being an armed career criminal. He went to trial

Page 33

1  and was convicted. But the guidelines, that would put him at
2  fifteen years. So the minimum sentence in that case was
3  fifteen years. But because of the guideline enhancements, he
4  was bumped up to way, way high. I can't remember exactly what
5  the sentence was.
6     THE COURT: So the Court there in the Pope case
7  actually viewed that even under the guidelines as unrelated
8  offenses, even if they were committed in two neighboring
9  buildings.
10    MS. JAMES: Right.
11    THE COURT: I assume one right after the other?
12    MS. JAMES: Right. And, you know, they just ran out
13 of one medical building and into the other.
14    THE COURT: Well how do you get around that, then?
15    MS. JAMES: Well, because I'm not willing to give up
16 that argument. I've held out hope for seventeen years on
17 Apprendi, I'm not going to give it up.
18    THE COURT: You did, didn't you?
19    MS. JAMES: Yes, sir.
20    THE COURT: And you've prevailed.
21    MS. JAMES: I've gotten vindication twice in Jimmy
22 Jackson, not credible, the decision. In the Moncrief case the
23 Court's finding that the Jacksons weren't credible, that goes
24 to the top of my list. And my vindication in Reese.
25    THE COURT: And you got your vindication in Reese.

Page 34

1  That's right.
2      MS. JAMES: So while that law is not favorable,
3  Judge, and I understand --
4      THE COURT: Could I see that Pope case?
5      MS. JAMES: I don't have it.
6      MR. MINER: Yes, Your Honor. I have a copy, it's my
7  file copy, so there are some notes.
8      (Whereupon the Court examined said document.)
9      THE COURT: How do I get around the circuit law,
10 though? And I use those words "around" in quotes.
11     MS. JAMES: In some regards, Judge, this is kind of a
12 -- I can see now, after having been over here off and on all
13 day, that these sentencings are going to be even now longer
14 than before, because we're arguing not only about the
15 guidelines, we're arguing the law. I think in terms of
16 sentencing, it will prolong things until we all get familiar
17 with what we're doing. But I don't agree with the Pope case.
18 Now --
19     THE COURT: But it is the law. I'm saying is it
20 distinguishable or isn't it from your case here?
21     MS. JAMES: In all candor, Judge, this case is worse.
22     THE COURT: Well let me read Pope. Even though I
23 know lawyers make arguments, I do like to read the law myself.
24 What pages should I read?
25     MR. MINER: Your Honor, it's highlighted and tabbed,

Page 35

1  and so I'm not sure exactly the page, but I believe the tabbed
2  page is the appropriate page.
3      THE COURT: Okay, I'll look at this. Let's take a
4  recess just while I look at this. And I think the lawyers
5  should be back on the other case.
6      And, Counsel, I'm going to have to recess until four.
7  Sorry. It's three twenty-one, and I have a conference call
8  with some other judges at three-thirty. So we'll have to come
9  back at four.
10     MS. JAMES: Are we likely to finish today?
11     THE COURT: Yes, we'll finish today.
12     MR. MINER: Would Your Honor also like the Lee case
13 that I cited earlier?
14     THE COURT: Yes, let me read that too.
15     Mr. Miner, tell the lawyers that my clerk has done
16 research on that crime of violence thing, and in looking at the
17 statutes she's going to bring the statutes down here and show
18 it to them.
19     MR. MINER: Yes, Your Honor.
20     THE COURT: To be prepared to respond to the statute.
21     (Whereupon, a recess was taken.)
22     THE COURT: Okay, Counsel. We're back on Mr.
23 Moultry's case.
24     MS. JAMES: We don't have the defendant.
25     COURTROOM DEPUTY CLERK: The marshals are bringing

Page 36

1  him in, sir.
2      THE COURT: Okay. Now, Miss James, I looked at your
3  Pope case.
4      MS. JAMES: I was wrong.
5      THE COURT: Okay.
6      MS. JAMES: It's been a while since I read the
7  opinion.
8      THE COURT: Well it primarily was only about the
9  statutory --
10     MS. JAMES: Statutory. So that helps my argument.
11 You can distinguish the two.
12     THE COURT: Okay. Is there anything anyone else
13 would like to say with regard to the application of the
14 guideline?
15     MR. MINER: Your Honor, I did find a case that spoke
16 to the guideline career offender relatedness determination, and
17 it dealt with two bank robberies that were committed on the
18 same day within ninety minutes of one another. And the
19 District Court judge at sentencing found that those two
20 robberies were distinct crimes because they dealt with distinct
21 banks, different banks and different tellers as victims. And
22 the District Court determined that they should be treated as
23 unrelated.
24     Insofar as we're dealing with ten burglary
25 convictions that are spread across two different days, I think

Page 37

1  that the argument in this case is actually stronger. That
2  case, Your Honor, is United States vs. Jones, 899 F.2d 1097,
3  Eleventh Circuit, April 30th, 1990. Just so the Court knows,
4  that case spoke to an issue regarding vulnerable victims, and
5  as to that aspect of the case it was overruled, but only on
6  that separate ground.
7      THE COURT: Now the Seventh Circuit has said that for
8  purposes of the guideline, "crimes a part of a single scheme or
9  plan only if they were jointly planned or one crime entails the
10 commission of the other." And I don't believe one crime
11 entailing the commission of the other is present here. So I
12 think one of the questions is whether this crime -- these
13 burglaries were all part of the plan.
14     You want to put your defendant on? Let's just ask
15 him some questions and we'll come back.
16     MS. JAMES: Okay.
17     THE COURT: I think you said you were going to put
18 him on?
19     MS. JAMES: Yes, Your Honor. He's not been sworn.
20     A D R I A N   M O U L T R Y,
21    the witness herein, having first been duly sworn or
22 affirmed to tell the truth, was examined and testified as
23 follows:
24              DIRECT EXAMINATION
25     BY MS. JAMES OF ADRIAN MOULTRY:

Page 38

1  Q. State your name, please.
2  A. Adrian Moultry.
3  Q. Speak up so everybody can hear you, okay?
4     Mr. Moultry, you have been in court today when we've
5  discussed your prior convictions in Pike County. You
6  understand what we're trying to do here?
7  A. Yes, ma'am.
8  Q. The Court's interested to know how this case came -- how
9  these cases came about. How many people were involved?
10 A. It was five of us.
11 Q. Were you all friends?
12 A. Yes.
13 Q. Did y'all get together and talk about what you were going
14 to do?
15 A. Yes, ma'am.
16 Q. And whose idea was it?
17 A. All of us.
18 Q. Were you all friends?
19 A. Yes, ma'am.
20 Q. Okay. And what was the plan?
21 A. To burglarize trailers.
22 Q. To burglarize trailers?
23 A. Yeah.
24 Q. Okay. And did y'all sit around and talk about how you were
25 going to do it?

Page 39

1  A. Yes, ma'am.
2  Q. How did that happen?
3  A. Decided to kick in doors.
4  Q. Okay. So did y'all just say -- Well what was the reason
5  for doing that?
6  A. To burglarize. To make money.
7  Q. Okay. Did y'all sit around and agree that you were going
8  to do that?
9  A. Yes, ma'am.
10 Q. How did y'all decide which places you were going to break
11 into?
12 A. The nearest trailer parks that were together.
13    THE COURT: Say what, now?
14    THE WITNESS: The nearest trailer parks that were
15 together.
16 Q. Are you saying all of these places that were broken into
17 were trailers?
18 A. Yes, ma'am.
19 Q. All the ten that we've described here today?
20 A. Yes, ma'am.
21 Q. Okay. Why did you all decide to break into trailers?
22 A. For money.
23 Q. No, I'm saying why trailers versus houses?
24 A. It was easy.
25 Q. Okay. So you're telling us that you targeted mobile

Page 40

1  homes?
2  A. Yes, ma'am.
3  Q. Okay. And did you all sit around and talk about well if we
4  bust in the door we could -- tell the Court how that happened.
5  You just explain it to the Court.
6  A. Sat around and decided that it would be easier to break
7  into trailers and get the things that we wanted.
8  Q. All right. Now you've heard me go over the time frames
9  here when these places were broken into. How close in time
10 were the ones that occurred on the 28th, those three that we've
11 talked about here?
12 A. Real close. It was back to back. Actually, between in the
13 morning time -- between the morning and evening time.
14 Q. What was your role?
15 A. Just entering with them and receiving property.
16 Q. Did somebody stay outside?
17 A. Yes, ma'am.
18 Q. So how many of y'all went on in the inside?
19 A. Like three.
20 Q. Okay. And was that the plan, to go in and get the stuff?
21 A. Yes, ma'am.
22 Q. And what were the ones outside doing?
23 A. Watching.
24 Q. Okay. What did y'all do when you got the stuff out of the
25 houses or the trailers?

Page 41

1  A. Put it in the car and take it to a certain place.
2  Q. Did you take it to the same place each time?
3  A. Yes, ma'am.
4  Q. And did y'all do on each and every one of these burglaries,
5  did you do the exact same thing?
6  A. Yes, ma'am.
7  Q. And would that be you kicked the door in?
8  A. Yes, ma'am.
9  Q. And you and two others went on the inside?
10 A. Yes, ma'am.
11 Q. And you got whatever loot you could find?
12 A. Yes, ma'am.
13 Q. And then you took it out and gave it to your lookouts.
14 Were y'all all traveling in one car?
15 A. Yes, ma'am.
16 Q. And then where was the location you would take to store the
17 stuff?
18 A. In Southland Travel Park.
19 Q. All right. Why is it that you did some on the 28th and
20 some on the 29th?
21 A. Because it was starting to get late in the day, so we
22 planned to just go the next day.
23 Q. Was it your plan to do these in the daytime?
24 A. Yes, ma'am.
25 Q. Is that because you didn't think people would be at home?

## Page 42

1  A. Yes, ma'am.
2  Q. Okay. So if it was night, are you saying there was a
3  better chance that people would be at home?
4  A. Yes, ma'am.
5  Q. So would it be safe to say, then, that you did as much as
6  you could on the 28th and then you continued on with your plan
7  on the 29th?
8  A. Yes, ma'am.
9  Q. Was the plan to continue even beyond that if y'all hadn't
10 been caught?
11 A. No, ma'am.
12 Q. Why is that?
13 A. Because we already had the plan of exactly what we were
14 going to do, and how many trailers we were planning on doing.
15 Q. And why did you all have a number?
16 A. Because we were going to get the money and do something
17 with it.
18 Q. Oh. So you had a need for the money right then?
19 A. Yes, ma'am.
20 Q. Okay. Did y'all have a plan in terms of where you were
21 going to get rid of the property, the stolen property?
22 A. Yes, ma'am.
23 Q. And where was that?
24 A. Some people we knew, some friends.
25 Q. That buy stolen property?

## Page 43

1  A. Yeah.
2  Q. Were you going to take all the property to those same
3  people?
4  A. Yes, ma'am.
5  Q. And with the money that y'all got, were you all to divide
6  that money among yourselves?
7  A. Yes, ma'am.
8  Q. So was there anything different about what your plan was
9  from the first day to the second day?
10 A. No, ma'am.
11 Q. Okay.
12       MS. JAMES: Judge, I don't know if you want me to
13 cover anything else.
14       THE COURT: No. I'll let the Government take him on
15 cross, and then I have some questions, too.
16       MS. JAMES: Okay.
17       THE COURT: Mr. Miner?
18       MR. MINER: Thank you, Judge.
19            CROSS EXAMINATION
20        BY MR. MINER OF ADRIAN MOULTRY:
21 Q. Mr. Moultry, you said you kicked in doors, is that right?
22 A. Yes, sir.
23 Q. But you also went through a window, didn't you?
24 A. No, sir.
25 Q. You didn't go through a window in any of these trailers?

## Page 44

1  A. No, sir.
2  Q. Okay. So it's your testimony that in each and every one of
3  these trailers you went in the exact same way?
4  A. Through the door.
5  Q. And if the presentence investigation report contradicts
6  your testimony, is your testimony that that would be wrong?
7  A. It would have to be.
8  Q. Now, sir, as to your plan, each of these were separate
9  buildings, these trailers, is that right?
10 A. Yes, sir.
11 Q. And you had to check out the surroundings of each of these
12 trailers before you have broke in, right?
13 A. Yes, sir.
14 Q. For instance, you had to make sure no one was home?
15 A. Yes, sir.
16 Q. And you had to make sure that in the neighboring trailers
17 no one was hanging outside where they could see you go inside,
18 is that right?
19 A. Right.
20 Q. So for each one, you had to check it out individually.
21 A. Saying?
22 Q. Making sure there was no one around.
23 A. Yeah.
24 Q. Reconnaissance on each one had to be done, isn't that
25 right?

## Page 45

1  A. Yeah.
2  Q. Because there could have been someone in any of these
3  trailers.
4  A. Yeah.
5  Q. So each of these different trailers, the break-ins had to
6  be planned in their own way, would be the best way to put it,
7  isn't that right?
8  A. If that's the way you want to put it.
9  Q. Now, sir, you went into ten trailers in all, is that
10 right?
11 A. Yes, sir.
12 Q. And you were the guy who actually went in.
13 A. Yes, sir.
14 Q. And was that partially because you were the smallest of
15 them in terms of being able to get in?
16 A. We all went in. I was one of the guys that went in.
17 Q. Okay. But it didn't have anything to do with the fact that
18 you were thin enough to get through a window?
19 A. No, sir.
20 Q. In some of these trailers -- They were in different trail
21 other parks, is that right? There was Whispering Pines Trailer
22 Park, is that right?
23 A. It wasn't Whispering, it was Forest Acres in Dozier.
24 Q. So it was Forest Acres in Dozier?
25 A. Yes.

Page 46

1 Q. And there was Pecan Drive?
2 A. Yeah.
3 Q. And there were three trailers there. And there was also
4 Falcon Drive. Do you remember breaking into one on Falcon
5 Drive?
6 A. I'm not for sure.
7 Q. But if that's in the records, you'd agree you did that
8 one?
9 A. If it's in the records. I'm not for sure. I don't
10 recall.
11 Q. Okay. So you don't remember exactly which ones you broke
12 into in terms of their locations, you just know they were
13 different locations?
14 A. No.
15 Q. Now since you can't remember the locations specifically, is
16 it possible you went in through one of the windows and you just
17 don't remember?
18 A. No. Went through the front door of all of them.
19 Q. Okay.
20      MR. MINER: Thank you, Your Honor.
21      THE COURT: Tell me again exactly what your plan was
22 before you actually proceeded to do the burglary.
23      THE WITNESS: What was our plan?
24      THE COURT: Mm-hmm. Tell me in detail who got
25 together, what each person said and what the plan was.

Page 47

1      THE WITNESS: Well, all five of us got together and
2 did --
3      THE COURT: Where did you meet?
4      THE WITNESS: At one of the person's houses that was
5 involved.
6      THE COURT: Whose house?
7      THE WITNESS: Tavaris (ph.) King.
8      THE COURT: What time did you meet?
9      THE WITNESS: In the early morning hours. I'd say
10 around eight.
11      THE COURT: Was this on the 28th?
12      THE WITNESS: Yes, sir.
13      THE COURT: Why did you all come together?
14      THE WITNESS: Because we hung out every day together.
15      THE COURT: Pardon me?
16      THE WITNESS: We hung out every day.
17      THE COURT: So this was just a day that you were
18 hanging out?
19      THE WITNESS: Yes, sir.
20      THE COURT: So you hadn't planned these burglaries
21 when you first got together?
22      THE WITNESS: No, sir.
23      THE COURT: So you got together, the five of you?
24      THE WITNESS: Yeah.
25      THE COURT: Tell me what happened.

Page 48

1      THE WITNESS: We were just sitting around the house
2 and one came up with the idea the way to come up with some
3 quick money.
4      THE COURT: Why did you need the money?
5      THE WITNESS: For all kinds of purposes.
6      THE COURT: Like what?
7      THE WITNESS: Just to be having it.
8      THE COURT: Go ahead.
9      THE WITNESS: And as one came up with the plan, we
10 all decided on it and we decided which trailer park that we
11 were gonna go to. And we all came over to the trailer park so
12 we decided to go by the trailer park and then to check out the
13 scene. And as we arrived there and checking it out, we see
14 that the trailer people weren't home. So we decided -- we
15 started to go into the trailers.
16      THE COURT: Okay. Now let's go back. You're sitting
17 around. And you decide you were going to go rob trailers. You
18 decided you were going to rob A trailer or a lot of trailers?
19      THE WITNESS: More than one.
20      THE COURT: More than one. Your plan was to rob a
21 particular trailer park, or a number of trailer parks or what?
22 Just tell me exactly what your plan was before you left the
23 place where you all had met at eight o'clock that morning.
24      THE WITNESS: We was planning to rob the trailer
25 park.

Page 49

1      THE COURT: A particular trailer park? Which trailer
2 park?
3      THE WITNESS: It was Forest Acres.
4      THE COURT: Forest what?
5      THE WITNESS: Acres.
6      THE COURT: How many trailers were you going to rob
7 at Forest Acres?
8      THE WITNESS: When we first got there we decided
9 three of them.
10      THE COURT: Three of them?
11      THE WITNESS: Right.
12      THE COURT: Before you have got there?
13      THE WITNESS: Yes.
14      THE COURT: And then when you got there. What
15 happened?
16      THE WITNESS: After we did that three, a couple of
17 guys came along and the next trailer park. They decided to do
18 the next trailer park.
19      THE COURT: Okay. Was this after you left Forest
20 Acres?
21      THE WITNESS: Sir?
22      THE COURT: What happened? You go to Forest Acres
23 and you break into three trailers. Then what happened?
24      THE WITNESS: We went on to the next trailer park.
25      THE COURT: When you said you decided to go to

Page 50

1 another trailer park and rob those trailers, did you make that
2 decision after you have left Forest Acres or while you were at
3 Forest --
4    THE WITNESS: While we was there.
5    THE COURT: Pardon me?
6    THE WITNESS: While we was there.
7    THE COURT: While you were there you decided to go
8 rob another trailer park.
9    Okay. How did this happen? I mean you're in the
10 trailers, you're breaking in, tell me how it comes about that
11 you suddenly decide to go rob another trailer park.
12    THE WITNESS: Because the guys feel like it was time
13 to go to another trailer park. They didn't want to do a lot in
14 one place, so we decided to go to the next one. We didn't want
15 to do them all in one place.
16    THE COURT: What do you mean you didn't want to do
17 them all at one place?
18    THE WITNESS: Because there is one -- there is not
19 that many in that area that we was in.
20    THE COURT: How many were there?
21    THE WITNESS: About ten.
22    THE COURT: But you only did three.
23    THE WITNESS: Yeah.
24    THE COURT: Why didn't you do the other seven?
25    THE WITNESS: We decide not to.

Page 51

1    THE COURT: Why?
2    THE WITNESS: There were people at home.
3    THE COURT: Oh. Okay.
4    So then you decided to go to another trailer park.
5 What trailer park was this?
6    THE WITNESS: Dozier.
7    THE COURT: Dozier Trailer Park.
8    THE WITNESS: Yeah.
9    THE COURT: Okay. So you decided to go to Dozier
10 while you were at Forest Acres.
11    THE WITNESS: Yes, sir.
12    THE COURT: Did you all meet to make this decision,
13 or were you in a trailer when you made this decision, had you
14 gotten back to the car when you made the decision or what?
15    THE WITNESS: We was in the car.
16    THE COURT: So you had already broken into the other
17 trailers when you made the decision to go to Dozier. You had
18 broken into the trailers at Forest Acres, right?
19    THE WITNESS: Yes.
20    THE COURT: And you had gotten the stuff, you were
21 back in your car gain, but still at Forest Acres?
22    THE WITNESS: Yeah.
23    THE COURT: Is that when you decided to do to Dozier?
24    THE WITNESS: We had planned to go to Dozier from the
25 beginning.

Page 52

1    THE COURT: Oh, you had planned to go to Dozier form
2 the beginning.
3    THE WITNESS: Yeah.
4    THE COURT: I misunderstood you, then. I thought you
5 were only going to go to Forest Acres in the beginning.
6    THE WITNESS: We did, but en route we decided we were
7 going to be doing that.
8    THE COURT: You've got me confused now. When you had
9 your meeting you were going to go to Forest Acres, right? When
10 did you decide to go to Dozier?
11    THE WITNESS: En route because we were talking about
12 how we were going to do it. And right before we've did the
13 first one, we already planned on -- we seen how the scene
14 looked and we see people at home in several other trailers, so
15 we already decided we would go out to Dozier after Forest
16 Acres.
17    THE COURT: Then you go to Dozier.
18    THE WITNESS: Yeah.
19    THE COURT: How many trailer parks did you end up
20 going to?
21    THE WITNESS: Two.
22    THE COURT: Just those two?
23    THE WITNESS: Yeah.
24    THE COURT: Now the burglaries occurred over two
25 days, though.

Page 53

1    THE WITNESS: Yes, sir.
2    THE COURT: Did Dozier occur on the 29th or was it on
3 both on the 28th and the 29th?
4    THE WITNESS: The 29th.
5    THE COURT: Okay. Well you burglarized the one at
6 Forest Acres. You only went into three. And you said before
7 you even got to Forest Acres you decided to go to Dozier?
8    THE WITNESS: Mm-hmm.
9    THE COURT: Why didn't you go to Dozier right then,
10 right after you --
11    THE WITNESS: Because of the time. It was getting
12 late, and we knew it was time that people would usually be
13 home, so we decided to wait to the next day and go early in the
14 morning when somebody probably wouldn't be there while they
15 were at work.
16    THE COURT: How long did it take you to burglarize
17 Forest Acres?
18    THE WITNESS: I don't recall exactly how long.
19    THE COURT: What?
20    THE WITNESS: I can't recall.
21    THE COURT: Well, you said you got there about when?
22    THE WITNESS: It was in the morning time. I know it
23 was during the morning hours.
24    THE COURT: But it took you all day to do that?
25    THE WITNESS: No.

**Page 54**

1  THE COURT: Well I don't understand why you didn't
2 have enough time to go to Dozier too before people would be
3 coming back.
4  THE WITNESS: Because the evening time was coming.
5 It was after lunchtime.
6  THE COURT: After lunchtime what?
7  THE WITNESS: Before we moved out of Forest Acres.
8 It was becoming after lunch. So we just decided to wait until
9 the next morning.
10  THE COURT: So what happened the next morning?
11  THE WITNESS: We all got together around the same
12 time.
13  THE COURT: But you had already decided you were
14 going to break into Dozier?
15  THE WITNESS: Yes.
16  THE COURT: Why didn't you go straight to Dozier,
17 then?
18  THE WITNESS: Because of the timing.
19  THE COURT: What do you mean "the timing"?
20  THE WITNESS: It was beginning to be evening time.
21  THE COURT: No, I mean that morning, why didn't you
22 just meet -- Why did you meet at this place? Why didn't you
23 just go straight to Dozier?
24  THE WITNESS: Because didn't one of us have a car.
25  THE COURT: Pardon me?

**Page 55**

1  THE WITNESS: Because didn't one of us have a car.
2  THE COURT: So you met at the same place again at
3 your friend's house?
4  THE WITNESS: Yeah.
5  THE COURT: And went to Dozier. What time did you go
6 to Dozier?
7  THE WITNESS: It was in the morning. I can't say
8 exactly when, but it was in the morning hours.
9  THE COURT: So there you burglarized seven trailers.
10 Why did you decide to do seven in Dozier and not do more at the
11 other place?
12  THE WITNESS: It just went on.
13  THE COURT: Any other examination from either of you?
14  MR. MINER: I have a couple of questions, but
15 Miss James I guess goes first.
16  MS. JAMES: I've just got a couple to clear up
17 something.
18  THE COURT: Okay.
19  REDIRECT EXAMINATION
20  BY MS. JAMES OF ADRIAN MOULTRY:
21 Q. In Dozier and in the other trailer park, do you know
22 whether students live there?
23 A. Yes, ma'am.
24 Q. And so when you tell the judge that it was getting up in
25 the afternoon, did that have anything to do with the fact of

**Page 56**

1 the school hours?
2 A. The school hours, yes, ma'am.
3 Q. Okay. That's all I've got.
4  THE COURT: Mr. Miner?
5  MR. MINER: Thank you, Judge.
6  RECROSS EXAMINATION
7  BY MR. MINER OF ADRIAN MOULTRY:
8 Q. Mr. Moultry, I believe you testified when the judge asked
9 you that you did not rob or break into and burglarize any of
10 the trailers at Dozier until August 29th, is that right?
11 A. Yes, sir.
12 Q. Now, sir, if the presentence report reflects that on August
13 28, 2000 Darren Paul Ellis reported to the Troy Police
14 Department that sometime between one-thirty p.m. and four-ten
15 p.m. his residence located at lot C, twenty-five Dozier Trailer
16 Park was burglarized, sir, how do you explain that in light of
17 your testimony that you didn't break into any trailer in the
18 Dozier Trailer Park on the 28th?
19 A. We didn't.
20 Q. Well now, sir, that's part of the conviction record for one
21 of the convictions that you admitted to. Are you saying that's
22 wrong?
23 A. Had to be, it was on the 29th.
24 Q. Okay. Sir, let's go back to you made a statement earlier
25 about the window and how all of these involved the door being

**Page 57**

1 broken into, is that right?
2 A. Yes, sir.
3 Q. The door was kicked in, is that right?
4 A. Yes, sir.
5 Q. Let me see if I can refresh your recollection as to
6 something and if it's wrong, just let me know. Looking to the
7 presentence investigation report -- Sir, and you've seen that,
8 right? You've gone through this report, haven't you?
9 A. Yes, sir.
10 Q. Okay. In paragraph thirty on page nine -- actually I'll
11 just go straight to page ten, relating to the conviction that
12 starts on page nine. "During the investigation police were
13 advised by one of Brian House's neighbors that he observed six
14 black males approach the house and two of the subjects entered
15 the residence through a bedroom window. Upon the subjects
16 entering the residence through the window, they opened the
17 front door and let the other individuals into the house.
18  "The neighbor advised the police that he saw all six
19 men enter the residence carrying items and leave in an older
20 model Pontiac."
21  Sir, that was an older model Pontiac that you all
22 were driving that day, is that right?
23 A. Yes, sir.
24 Q. Does this refresh your recollection as to how you may have
25 carried out that robbery?

Page 58

1  A. I don't remember there being no window.
2      MR. MINER: Your Honor, those are my only questions.
3      THE COURT: Anything else, Counsel?
4      MS. JAMES: Nothing further.
5      THE COURT: You may step down.
6      (Whereupon the witness, Adrian Moultry, stepped down
7  from the stand.)
8      THE COURT: Now, Miss James, is the only issue,
9  factual issue I need to resolve whether he qualifies as a
10 career offender with the guidelines?
11     MS. JAMES: Well not to get away from my first
12 argument, Your Honor, I still make the first argument that
13 application of either of those provisions would be contrary to
14 the Blakely decision and Booker part one. And when I say "part
15 one" I'm talking about the majority opinion --
16     THE COURT: How?
17     MS. JAMES: Well, because he pled guilty and the
18 Government didn't make a factual basis, nor did he admit to
19 conduct giving rise to either of those enhancements.
20     THE COURT: What do you mean "either of those
21 enhancements"? I thought we already got rid of the statutory
22 career.
23     MS. JAMES: Right, but we've got the -- the probation
24 officer suggested either/or. It doesn't impact anything but we
25 get a bump from a twenty-six to a thirty-four if you were to

Page 59

1  either apply armed career criminal or career offender. Both
2  are guideline provisions. They're not statutory, they're
3  guideline sentencing enhancements based on prior convictions.
4      THE COURT: Explain the Booker argument.
5      MS. JAMES: Well, we can't ignore what Booker held in
6  part one, and that was that you have to charge anything that's
7  going to take something out of statutory maximum or the
8  sentencing enhancements have to be charged and proven to a jury
9  beyond a reasonable doubt, or in the case of a plea the
10 defendant would have to admit it. And he didn't admit it, nor
11 did the Government elicit any factual basis in support of
12 either of those enhancements. So I think those two
13 enhancements, if we were going on the guidelines, we were just
14 -- that would be my argument if we were --
15     THE COURT: But we're not under mandatory guidelines.
16     MS. JAMES: If we were, that would be my argument.
17 But it's still important in terms of where if you are going to
18 use the guidelines as advisory, it is still important where we
19 start. And it also has another interesting tangle. If you
20 apply either of those enhancements, armed career offender or
21 career offender, we automatically are bumped to a criminal
22 history score of six, regardless of what his criminal history
23 score would be.
24     I cannot make an argument under that scenario that
25 his criminal history score overrepresents the seriousness of

Page 60

1  his criminal conduct because you simply have to go with the
2  base level -- I mean the criminal history score of six. In the
3  alternative, if those two provisions one or the other were not
4  applied, then I can make the argument that his criminal history
5  score of six, which is based on these ten prior burglary
6  convictions, overrepresents the seriousness of his criminal
7  conduct.
8      THE COURT: So what -- Why should I do this just so
9  you can make an argument? I'm not quite following you.
10     MS. JAMES: Well, I'm saying your decision on the
11 first part impacts whether or not I have to make that argument.
12 I can't get there. That argument becomes moot if you rule that
13 either of those apply.
14     THE COURT: Okay. Anything else from the Government?
15     MR. MINER: Your Honor, I would submit that there was
16 a factual basis as to all of these prior felony convictions.
17 It's set forth in the actual plea agreement in the factual
18 basis section; where all ten of the burglary convictions are
19 listed with case number on page six of the plea agreement, as
20 well at the plea colloquy. I believe it was conducted by Judge
21 McPherson.
22     Ms. James wasn't present, so she may not remember it,
23 but Judge McPherson did ask the defendant what he was convicted
24 of, and he stated, "Burglary third. Ten counts of burglary
25 third" on page nineteen of the change of plea transcript. It

Page 61

1  was laid out in the record.
2      Now as to the question of law, I think it would be
3  unfair to put to Mr. Moultry an armed career criminal would be
4  -- that would be one question and it would be over with and he
5  wouldn't know exactly what I was asking him. But it was
6  explained in the record, that the Government was seeking and
7  the plea agreement was to a two hundred and sixty-two month
8  sentence. And that starting from that point the Government
9  moved for substantial assistance credits, and that was
10 explained in the plea colloquy.
11     THE COURT: Now without the career offender and
12 enhancements, under the guideline what would his guidelines be?
13     MS. JAMES: Judge, he would be a level twenty-six.
14     MR. MINER: That is incorrect, Your Honor.
15     THE PROBATION OFFICER: No, sir, it would be a
16 thirty.
17     If you apply armed career and not career?
18     MS. JAMES: Oh, I thought he said if you didn't apply
19 either one. I'm sorry.
20     THE COURT: If I don't apply either one.
21     THE PROBATION OFFICER: Oh, if you don't apply either
22 one, then of course it would go back to a twenty-six.
23     MS. JAMES: Minus three giving a level twenty-three,
24 for acceptance, a criminal history score of six puts him at
25 guidelines of ninety-two to one-fifteen. And it's my argument

### Page 62

1  that --
2      THE COURT: Now how do you get a six for his criminal
3  history?
4      MS. JAMES: He has a six either way.
5  Right?
6      THE PROBATION OFFICER: I think he's enough -- well,
7  if you found some of those burglaries were related, then it may
8  not be a six, Your Honor.
9      THE COURT: I don't quite understand. If I find the
10 burglaries were related, how do you get a six, then?
11     THE PROBATION OFFICER: That's what I'm saying, I
12 don't think you can get to a six if they're related.
13     THE COURT: If I conclude the burglaries are related,
14 doesn't that affect his criminal history score, too?
15     THE PROBATION OFFICER: Yes, sir. He can only get
16 one set of points.
17     THE COURT: That's right.
18     MS. JAMES: Okay. So he would be what, about a
19 three?
20     THE PROBATION OFFICER: Two.
21     MS. JAMES: Criminal history two?
22     THE PROBATION OFFICER: Well, he would be a three
23 because he'd have one other offense that we're counting.
24     MS. JAMES: And, Judge, under that scenario, the
25 guidelines would be fifty-seven to seventy-one months.

### Page 63

1      THE COURT: Okay. Now with the criminal -- if the
2  burglaries are not related, how do you get six?
3      THE PROBATION OFFICER: If they are not related?
4      THE COURT: Yes.
5      THE PROBATION OFFICER: Each one is counted
6  separately, so the points came out to thirty some odd points.
7  And of course that puts us --
8      THE COURT: Well beyond six?
9      THE PROBATION OFFICER: Yes.
10     MR. MINER: Your Honor, for the Government, I think
11 that we also need to consider that if the provisions of the
12 armed career criminal statute are considered, even not looking
13 at the guideline calculation of relatedness, the defendant
14 still would be deemed armed career criminal.
15     THE COURT: Right.
16     MR. MINER: Armed career provisions of the guidelines
17 and it and would be a criminal history category of six because
18 the relatedness inquiry doesn't come into the picture.
19     THE COURT: Right. And he's looking at a minimum
20 sentence there of twenty years.
21     MR. MINER: Twenty years as well, Your Honor. If
22 that is applied, then the armed career criminal provision of
23 the guidelines which is 4B1.4 would automatically presumptively
24 apply, and as well he would be at that point a criminal history
25 category of six. The relatedness inquiry doesn't appear to

### Page 64

1  come up new 4B1.4.
2      THE COURT: Now does the definition under the
3  guidelines of "armed career" and "armed career offender," are
4  those definitions the same?
5      THE PROBATION OFFICER: They mirror each other for
6  armed career in the guidelines and armed career in the statute?
7      THE COURT: Yes.
8      THE PROBATION OFFICER: Yes, sir. They --
9      THE COURT: No, armed career -- I thought you said it
10 was armed career in the guidelines and armed career -- I
11 thought you said there was armed career in the guidelines and
12 career in the guidelines, too.
13     THE PROBATION OFFICER: Yes, sir.
14     THE COURT: And these two mirror each other?
15     THE PROBATION OFFICER: No, sir, not completely.
16     THE COURT: But armed career in the guidelines and
17 armed career in the statutes do mirror each other?
18     THE PROBATION OFFICER: Yes, sir.
19     THE COURT: Now my question is this: Under the
20 guidelines, if he is an armed career under the statute, why
21 isn't he an armed career under the guidelines?
22     MS. JAMES: Well --
23     THE COURT: Because, you know, you wanted me to
24 consider this purely as a guidelines case.
25     MS. JAMES: In hindsight maybe the plea was

### Page 65

1  ill-advised.
2      THE COURT: I don't want to get back to what's
3  ill-advised. My question is, I'm viewing this case purely as a
4  guidelines case. We're not going to get into the statute. But
5  the guidelines themselves have an armed career provision,
6  right?
7      MS. JAMES: Right.
8      THE COURT: That mirrors the statutes. So looking
9  purely at the guidelines, he still is going to be viewed as --
10 the burglaries will still be viewed as unrelated under that
11 particular provision of the guidelines.
12     MS. JAMES: I can't understand what you're saying.
13 I'm not going to agree, but I understand what you're saying.
14     THE COURT: Well I'm not saying it, that is a
15 question. I'm asking you to respond. Just looking at this as
16 a pure guidelines case under the statute it says "armed
17 career," I'm assuming the provision of relatedness doesn't
18 apply there, why aren't these viewed as separate offenses?
19     MS. JAMES: May I have one moment?
20     THE COURT: Yes.
21     (Whereupon, Ms. James examined various documents at
22 counsel table.)
23     THE COURT: What is the provision of the statute? In
24 the guidelines, what is the provision of the guidelines deal
25 with, armed career?

Page 66

1  THE PROBATION OFFICER: 4B1.4.
2  THE COURT: 4B1.4?
3  THE PROBATION OFFICER: Yes, sir.
4  THE COURT: And what is the provision that deals with
5 just career under the guidelines?
6  MR. MINER: 4B1.3, Your Honor. It's immediately
7 preceding.
8  THE COURT: 4B1.3?
9  THE PROBATION OFFICER: No, sir, it's actually 4B1.1.
10  MR. MINER: Oh, that is correct, Your Honor. I'm
11 sorry. 4B1.3 is criminal livelihood.
12  THE COURT: So 4B1.4 is armed career, and 4B1.1 is
13 just career?
14  THE PROBATION OFFICER: Yes, sir.
15  THE COURT: And these two -- and 4B1.4 armed career
16 basically mirrors the statute?
17  THE PROBATION OFFICER: Yes, sir.
18  THE COURT: So it doesn't have that provision about
19 relatedness in it?
20  THE PROBATION OFFICER: No, sir, not to the extent of
21 4B1.1. They just have to be committed on occasions different
22 from one another.
23  THE COURT: Right. So I guess my question for
24 Miss James is, even if I agreed with her on 4B1.1 that he's not
25 a career offender, why isn't he still an armed career offender

Page 67

1 under 4B1.4?
2  MS. JAMES: Well, I don't think I can -- I can't add
3 anything additional.
4  THE COURT: Okay. I'm going to continue sentencing
5 until Monday morning. We'll start at ten.
6  MS. JAMES: Judge, I already have to be in Michigan
7 on Monday and Tuesday.
8  THE COURT: Monday and Tuesday?
9  MS. JAMES: Yes, Your Honor.
10  THE COURT: Okay. We'll reconvene on Wednesday at
11 ten o'clock.
12  MS. JAMES: I'm flying back in that morning. Is
13 there any way we can do it later in that afternoon? I'm flying
14 into Birmingham.
15  THE COURT: We can do it at two.
16  MS. JAMES: At two o'clock? Okay. Thank you, Your
17 Honor.
18  MR. MINER: Your Honor, I would ask if at all
19 possible if Miss James could file her sentencing brief in this
20 matter. I'm still not clear on what her position is because
21 never has --
22  THE COURT: She hasn't filed a sentencing brief?
23  MS. JAMES: I filed a Blakely brief, Your Honor, and
24 I filed -- as I told your law clerk, the only thing I would say
25 in addition to what I previously argued was refer the Court to

Page 68

1 the Booker decision. I'm happy to do that, but I didn't plan
2 on submitting --
3  THE COURT: I'll be honest with you, either your
4 Booker argument is so nuance that it eludes me or it's wrong,
5 one or the other. And I'm giving you the benefit of the doubt
6 when I say "so nuance that it eludes me."
7  What are you asking for?
8  MR. MINER: I just want to be able to understand it.
9 In the prior cases where we had the Booker arguments, Your
10 Honor, you set out a briefing schedule so the parties know the
11 respective positions when they come to court, and that's the
12 reason why I had this parade of cases stacked around me, trying
13 to anticipate the -- well, just any possibility.
14  THE COURT: You want her to get her argument filed by
15 Wednesday and we'll reschedule this for Thursday?
16  MR. MINER: If she simply calls before of the hearing
17 and we can figure it out, I'll be fine with it. I just want to
18 be able to know what it is.
19  THE COURT: Why don't you get it to us in writing by
20 Wednesday afternoon at four o'clock.
21  MS. JAMES: Okay.
22  THE COURT: And we will reconvene on Thursday morning
23 at ten o'clock.
24  MS. JAMES: Thank you, Your Honor.
25  (Whereupon, the proceedings were concluded.)

Page 69

* * * * * * * *

COURT REPORTER'S CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter as prepared by me to the best of my ability.

I further certify that I am not related to any of the parties hereto, nor their counsel, and I have no interest in the outcome of said cause.

Dated this 21st day of March 2006.

MITCHELL P. REISNER, CM, CRR
Official US Dist. Court Reporter
Registered Professional Reporter
Certified Real-Time Reporter